Bruce I. Afran (BA 8583)
10 Braeburn Drive
Princeton, New Jersey 08540
609-924-2075

Attorney for Plaintiff

07 CV 7477

Judge Pauley

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------
MDM BUSINESS TECHNOLOGIES GROUP, INC.,   Case No:

    Plaintiff,

    v.   Complaint

GIRL SCOUTS OF THE UNITED STATES OF
AMERICA; and DIGITAL PRODUCTS, INC.,   Civil Action

    Defendants.   Jury Trial Demanded
-------------------------------------------------------

AUG 23 2007
U.S.D.C. S.D. N.Y.
CASHIERS

    MDM BUSINESS TECHNOLOGIES GROUP, INC. (MDM) by its attorney asserts as follows:

### Introduction

    In this complaint, MDM asserts that Girl Scouts of the United States of America (Girl Scouts), alone and/or in conspiracy with Digital Products, Inc. (DPI), engaged in discriminatory and anti-competitive conduct by designing and structuring a bid for photocopy equipment to favor one particular bidder, DPI, to the competitive prejudice of all other bidders, including MDM. Such conduct violates the Sherman and Clayton Acts' prohibition on anti-competitive conduct and the New York Donnelly Act. MDM asserts that Girl Scouts intentionally designed the bid to require the inclusion of commercially unnecessary and unassociated product and equipment configurations that only one bidder,

DPI, could supply on a competitive basis and that such bid conditions materially encumbered other bidders who were rendered non-competitive with the favored bidder. Girl Scouts also concealed the waiver and abandonment of certain bid conditions that, if made known to MDM prior to submitting its bid proposal, would have enabled MDM to reconfigure its bid to be the winning low bidder. MDM also asserts that Girl Scouts breached its duty of fair dealing by rigging the bid to favor DPI and by failing to accept reasonable modifications to the RFP to restore a level playing field in which all bidders could compete equally. MDM asserts that Girl Scouts committed fraud by concealing the abandonment of certain material bid conditions –i.e., a requirement that the winning bidder make a $40,000 cash payment to Girl Scouts and equip the vended equipment for network scanning and printing - while enabling the winning bidder, DPI, to escape enforcement of these criteria; had MDM been informed that these conditions had been waived, MDM could have reformulated its bid to become the winning low bidder.

### Parties, Jurisdiction and Venue

1. MDM is a corporation organized under the laws of the State of New York and doing business in the County of New York.

2. MDM is a dealer in photocopy machines and in the servicing and supply of photocopy machines.

3. Girl Scouts of the United States of America (Girl Scouts) is a non-profit corporation with its principal place of business in the County of New York.

4. Digital Products, Inc. (DPI) is a copy machine dealer whose principal place of business is in the County of New York.

5. By virtue of the foregoing, venue is properly in the Southern District of New York and jurisdiction is properly vested in this Court pursuant to 28 U.S.C. 1331 by virtue of a federal question arising under the Sherman and Clayton Acts, 15 U.S.C. 1, *et seq.* and 15 U.S.C. 15, *et seq.*

### Factual Background

### MDM's Relationship with Girl Scouts

6. Beginning in or about November 2001, MDM and the Girl Scouts entered into a business relationship in which MDM provided leased Konica digital photocopy equipment and associated support services.

7. The initial agreement derived from a solicitation by Girl Scouts for a major copier products and service vendor, as expressed in Girl Scouts' 2001 Request for Proposal (RFP).

8. At the time, Xerox Corporation was the incumbent vendor in the Girl Scouts' New York corporate Copy Center; Sharp Electronics Corp. maintained a fleet of ten (10) photocopiers in Girl Scouts' satellite locations.

9. As part of the award of the initial RFP to MDM, Girl Scouts checked into MDM's background and references and undertook a significant background review of MDM's capabilities as a vendor.

10. The initial contract award to MDM covered a 60-month period; MDM also entered into a series of subsequent agreements with Girl Scouts to provide, service and supply copy machines at various Girl Scouts' locations with durations of between 18 and 60 months.

11. MDM's agreements with Girl Scouts are a form of warranty under which MDM agrees in return for a fixed monthly payment and usage charge to maintain and repair said machines for all normal wear and tear during the term of the service agreement and to provide consumable supplies.

12. During the period March 2002 through February 2007, MDM was a principal supplier of leasing and services for copy machines to the Girl Scouts at Girl Scouts' New York City location and at Girl Scouts' Edith Macy Center New Jersey warehouse location; MDM also assisted in copier placement at the Girl Scouts' offices in Atlanta, Georgia, where MDM procured a local vendor to supply certain specialized equipment needed at that locale.

Girl Scouts Issues a Request for Proposals (RFP) for New Copiers

13. On or about June 3, 2004, the Girl Scouts' manager of National Properties/Office Services, Eric B. Hill, issued a Request for Proposals (RFP) to MDM and several other copier service providers, including Digital Products, Inc. (DPI), which at the time of the RFP had been in business for less than three years; the RFP sought a blend of copiers, including convenience, color and binding equipment. Other providers who received the RFP included Xerox, Mita and Canon, each of whom had been in the copier services business for decades, as had MDM.

14. The RFP set forth specific machinery configurations that Girl Scouts purportedly required in the replacement of their then-current equipment. Included in the RFP were various "bundled" line items for "a Station folder-One (1) Four Inserter", "(1) GBC TL2900 Twin Loop Wire Binder" and "(1) GBC Digicoil Automatic "Coil Inserter w/ Oversize die for AP2Punch". These items were not available from copier

manufacturers and to comply with these RFP requirements bidders on the RFP needed access to third party sources: of all bidders on the RFP only DPI had such third party access, due to its interlocked ownership with Addressing Systems and Products, Inc. (ASAP), a bindery and mailing equipment maker. See *infra* at para. 19. The RFP's inclusion of these extraneous bindery and insert requirements placed all bidders aside from DPI in a position of immediate competitive prejudice.

15. In addition to an integrated composite financial bid, the RFP required that "Your offer must include the buy-out of our existing equipment leases, which total $40,000. **You will write a check to Girl Scouts of the USA for this amount**." See RFP annexed hereto [Emphasis added]. This condition required that the winning bidder would make a cash payment to Girl Scouts in the amount of $40,000 to pay off the value of Girl Scout's existing leases. Any vendor bidding on the RFP, including MDM, understood and assumed that such monies had to be remitted to Girl Scouts upon the award to the winning bidder; hence, MDM, like the other bidders, included the $40,000 cash payment in its financial calculations in formulating the bids; the $40,000 payment was understood to be a material cost on the bid. A copy of the RRP is annexed as Exhibit 1 hereto.

The Discriminatory Structure of the RFP

16. The purpose of an RFP is to solicit, through a fair and level playing field for all bidders, a true low bid for a given commercial proposal by means of independent informational and financial responses from each respondent bidder.

17. By contriving machine specifications and equipment bundling that only DPI could competitively satisfy, Girl Scouts' June 2004 RFP was structured to enable only DPI to competitively bid and supply product.

18. The RFP required that the winning bidder provide copiers running a speed of 40 cpm (copies per minute) with a 100 page ADF (Automatic Document Feeder), though the areas where the machines were to be placed were relatively low volume environments, not previously requiring such high speed/high volume specifications. Girl Scouts had not previously mandated any such specification in their prior agreements with MDM.

19. At the time of the RFP, the 40 cpm, 100 page ADF specification could be met only by a single brand of copier, Mita, that only DPI dealt in. But even Mita, though the manufacturer of such machine, could not competitively satisfy the RFP because Mita did not manufacture the added bindery equipment that the RFP required be bundled to the copier bid, which only DPI, among the bidders, was in a position to supply at a favorable discount: DPI was 50 per cent owned by Marshall Goldberg, the principal of Addressing Systems and Products, Inc. (ASAP), a bindery and mailing equipment manufacturer and, as a result of such interlocked co-ownership, DPI could obtain the bindery attachment at a favorable discount compared to the other bidders. (The remaining 50 per cent of DPI's stock was owned by Frederick Robert Habeeb.)

20. Thus, although the RFP was supposed to provide all bidders with an equal opportunity to secure the Girl Scouts' business, the required machine configuration of 40 cpm with 100 sheet ADF *and* the additional bindery equipment requirement could be satisfied by only one bidder, DPI: among the bidders, only DPI dealt in Mita machines

(the only machines on the market with 40 cpm, 100 page ADF capacity) and had access to bindery equipment at a discount (through its interlocked ownership with ASAP). For MDM (or any other bidder) to comply with the RFP's cpm and ADF requirements, MDM would have had to elevate its selected product to a more expensive pricing category (i.e., a machine with a cpm faster than 40 pages per minute), at a material pricing disadvantage and, even then, MDM would still not have been able to obtain the required bindery equipment at DPI's insider price. As noted in paragraph 19 *supra,* even though Mita manufactured a machine with the required 40 cpm, 100 page ADF specification, even Mita could not provide the bindery equipment attachment that only DPI could obtain at a discount due to its interlocked ownership with ASAP, the bindery manufacturer.

21. Thus, the bid was designed to enable only DPI, among all the bidders, to be the successful low bidder.

22. The RFP was designed to eliminate rather than encourage competition, being structured so as to enable only DPI, among all the bidders, to bid the specifications at a competitive cost.

23. Prior to the June 2004 RFP, Girl Scouts had never required or had any historical business need for such specifications for its copy machines.

24. Although MDM had been a principal supplier of copiers and copying services for several years to the Girl Scouts, Girl Scouts had never asked MDM for, or sought, such cpm/ADF specifications or expressed a need for such equipment bundling.

25. The 100 page ADF attachment and bindery bundling was not commercially necessary, was not required by Girl Scouts for its business needs and had the purpose and/or effect of rendering all bidders aside from DPI non-competitive.

26. Consequently, the bid was intentionally structured and/or had the effect of excluding all bidders other than DPI and was intentionally structured to and/or had the effect of favoring DPI over all other bidders.

27. Eric Hill's successor, Joseph Montalbano, effectively acknowledged the invalidity of the RFP award to DPI in February 2006 when he sought to terminate DPI's copier leases. In a series of discussions stemming from a February 13, 2006 meeting with Michael Levine at which Mr. Levine explained the unfair and discriminatory nature of the RFP, Montalbano acknowledged that he had tried to terminate DPI's leases but that the assignee, CitiCapital, was uncooperative since the leases had only been recently engaged for a period of five years going forward. Since Montalbano was unable to cancel the DPI leases, he chose to cancel MDM's outstanding leases causing MDM to be the economic victim of the discriminatory RFP.

Girl Scouts' Refusal to Modify the Bid to Permit a Level Playing Field

28. Upon review of the RFP, MDM expressly asked Girl Scouts on June 3, 2004 for a modification that would accept equivalent copy and scanning speed with an ADF attachment that could be supplied by MDM or other bidders. This request was a part of a request for accommodation memorandum provided to Girl Scouts by MDM containing several requests for changes to the RFP. See e-mail dated June 3, 2004 from Charles Clarke to Eric Hill (the "Accommodation Memorandum"), annexed as Exhibit 2 hereto.

29. The Girl Scouts provided some answers to MDM's Accommodations Memorandum but items 6,7 and 8 of the Accommodations Memorandum - the requests for a modification to the 40 cpm, 100 ADF attachment and a request concerning the

bindery component - were left unanswered. In reply to MDM's very specific requests to equalize the bid conditions, Eric Hill refused accommodations, replying, "just bid". See e-mail of Eric Hill to Charles Clark, June 3, 2004, annexed as Exhibit 3 hereto.

30. In response to a second request by MDM for accommodations, Hill again refused to make changes to equalize the bid conditions, replying in even more disparaging language,

> "Just quote, why are you making this so difficult, make your bid and we'll talk later. Come on Charlie, I got way more important things going on than this bid. Bid and let's move on."

See e-mail of Eric Hill to Charles Clarke, June 8, 2004, annexed as Exhibit 4 hereto.

31. On June 28, 2004 Clarke wrote to Kowack, Eric Hill's supervisor at Girl Scouts, questioning the basis of the $40,000 (Forty Thousand Dollar) buyout provision and setting forth the lack of commercial justification for such provision. Clarke pointed out that the actual cost value of the Girl Scouts' existing leases would have been not more than $15,000 (Fifteen Thousand Dollars), not the $40,000 stipulated in the RFP. Upon information and belief, Girl Scouts' only lease requiring a buyout was for a Xerox Doccolor 40 machine with an estimated buyout of approximately $13,000 (Thirteen Thousand Dollars). Other machines leased by Girl Scouts were in month-to-month renewal status or were rentals not requiring any buyout. Consequently, Girl Scouts had no commercial basis for the $40,000 buyout condition.

32. Clarke's June 28, 2004 memorandum to Kowack gave notice to Girl Scouts of these discrepancies and the lack of commercial basis for the $40,000 buyout provision but Girl Scouts refused to re-bid the RFP or reformulate the buyout condition. See

Memorandum dated June 28, 2004 from Charles Clarke to Bill Kowack, annexed as Exhibit 5 hereto.

33. Unknown at the time to MDM, the $40,000 buyout provision was waived for DPI after DPI was awarded the bid. See *infra* at para. 68.

34. Prior to the onset of the testing trials of MDM and DPI's machines, MDM made at least two efforts to expressly inform Girl Scouts of the discriminatory nature of the RFP.

35. The first effort occurred in a meeting in the first week of September 2004 with Girl Scouts officials William Kowack and Eric Hill. At the meeting, MDM's President Michael Levine expressly identified the discriminatory aspects of the RFP and that the RFP appeared designed to favor DPI. Levine expressly stated his belief that Hill was in collusion with DPI to structure the RFP to DPI's advantage.

36. In a second meeting in October 2004 with Girl Scouts administrator Deborah Williams (also attended by Hill and Kowack), Levine repeated these facts and reiterated the belief that Hill was in collusion with DPI in structuring the RFP to favor DPI.

37. Despite these express communications, Girl Scouts refused to modify the discriminatory provisions of the RFP. To the contrary, as set forth at paras. 51-62, *infra*, following these discussions Girl Scouts proceeded to conduct machine trials that materially favored DPI and discriminated against MDM.

<u>Hill's Admission that the high volume and speed requirements</u>
<u>were commercially unnecessary.</u>

38. In his e-mail correspondence with Charles Clarke, Hill effectively admitted that Girl Scouts had no commercial need for the RFP specifications providing for high

copy volume and speed. To secure the bid, MDM had proposed a change in the bid configuration to a 50 sheet ADF with a 200 page memory, a machine that MDM could supply with equivalent capacity to that sought in the RFP and that would have relieved MDM of the added burden of $3,000 per unit necessitated by MDM's need to supply a higher level machine to meeting the RFP specifications. MDM sought to offer this alternate configuration because it could not supply a machine with the limited 40 cpm, 100 sheet ADF specifications in the RFP but had to offer a more expensive machine to meet these conditions. MDM sought to meet this cost discrepancy by offering a machine with a small ADF feed capacity but with faster scanning capacity. Not only did Hill refuse to accept such a modification, though it would have provided both operational savings and higher scan speeds, Hill replied that both volume and scan speed were irrelevant. **"Most of the runs are short, who cares about the scan speed**," Hill replied by e-mail to Charles Clarke. See e-mail of "Eric Hill to Charles Clarke, June 3, 2004, annexed as Exhibit 6 hereto.

39. By this admission that the "runs are short" and that no one "cares about scan speed", see e-mail of Eric Hill, *supra*", Hill effectively acknowledged that Girl Scouts' specification of the 100 sheet Automatic Document Feeder was not commercially necessary and beyond Girl Scouts' actual needs which involved "short runs", *Id,* not large volume feeder capacity.

40. As Hill's admission demonstrates, the 100 sheet ADF specification was imposed on the RFP without commercial need or justification, but for the purpose of excluding or financially encumbering other bidders (aside from DPI) who could not supply the 100 ADF attachment with the 40 cpm capacity. Although Mita could also

11

supply the 40 cpm, 100 sheet ADF, since it was the maker of the only conforming machine then available, Mita still could not supply the required bindery equipment that only DPI among all the bidders could supply at an insider price. Thus, the specifications of the RFP had the effect, without commercial necessity, of excluding all bidders other than DPI. Despite the obvious discriminatory nature of the bid conditions, Girl Scouts refused any of MDM's requested accommodations.

41. In order for MDM to offer a machine that satisfied both the 40 cpm requirement *and* the 100 sheet ADF requirement, MDM was forced to bid a more expensive machine operating at higher speeds (i.e., 55 cpm) that imposed a cost factor of more than 30 per cent against the 40 cpm Mita machine, thereby compelling MDM to bid higher than DPI, a demonstration of the bidding disadvantage built into the RFP. Had Girl Scouts accepted MDM's requested modification to the RFP, MDM would have been able to bid a competitive machine at equivalent capacity with no cost disadvantage when compared to DPI. However, Girl Scouts refused any such modification to the RFP and insisted upon the restrictive configuration that favored one bidder, DPI, against all others.

42. MDM's bid on the RFP was rendered uncompetitive as MDM had to include higher cost factors for these special order adjustments that only DPI could supply from its regular product line. Other bidders, including Canon and Xerox were similarly encumbered by the discriminatory conditions.

43. Neither MDM nor any other bidder aside from DPI could supply the described copiers and bundled bindery equipment at a competitive cost because their manufacturers did not produce machinery with the required configuration and none aside from DPI had access to bindery equipment at an insider price. (As noted above, even Mita, as the

maker of the only machine that could satisfy the RFP's configuration, could not bid successfully as it lacked DPI's interlocked relationship with ASAP that enabled DPI to supply the required bindery equipment at a discount. *See* para. 20, *supra*.

Girl Scouts' Use of the Discriminatory Bindery Equipment Condition<br>to Force the Award of the Bid to DPI

44. The requirement that a GBC TL2900 from General Binding Corporation be supplied by the winning bidder was included in the RFP without commercial need and with the effect and/or the purpose of benefiting DPI, which was the only bidder capable of supplying GBC binding equipment at an insider price through its affiliate ASAP, a GBC dealer. Of all the invited bidders, only DPI had a cross relationship with a bindery equipment dealer that gave DPI a material pricing advantage.

45. The binding requirement made no commercial sense as Girl Scouts already had GBC binding equipment, had an existing commercial relationship with GBC and could have obtained any additional GBC equipment directly from GBC; there was no commercial need for Girl Scouts to bundle bindery equipment to the copier proposals, a condition that was designed to put all bidders at a financial disadvantage to DPI which alone among the bidders could obtain such equipment at an insider price.

46. At the time of the RFP, only DPI had an interlocked relationship with a binding equipment vendor: Marshal Goldberg, a fifty per cent owner of DPI was, as of the time of the RFP, the principal owner of ASAP, a bindery equipment dealer and could supply GBC binding equipment to DPI at a material discount from the market, a commercial advantage that, among the bidders on the RFP, was available *only* to DPI.

See *supra* at paras. 19-20. By means of this interlocked relationship, only DPI could supply the specified GBC equipment at a discount, thereby obtaining a pricing advantage over all other bidders.

47. By including a binding equipment requirement that only DPI could satisfy on a discounted basis because of its interlocked relationship with ASAP, Girl Scouts designed the bid to favor DPI as against the other invited bidders.

48. Accordingly, the RFP provided DPI with an unfair competitive advantage without commercial or economic justification. Indeed, the RFP appears to have been intentionally skewed to give a direct commercial opportunity to DPI, a start-up less than three years old without an independent business history, without even its own offices, being housed at the time of the RFP at ASAP's corporate offices, further underscoring its relationship with the bindery equipment maker. For Girl Scouts to design an RFP that favored only one potential bidder, a start-up entity that had no independent track record or independent business existence compared to the decades-long experience of each of the other bidders, is contrary to ordinary commercial usage and had the effect and/or purpose of skewing the bid in favor of a single bidder.

<u>Girl Scouts' Attempted Concealment of DPI's Bid</u>

49. Girl Scouts attempted to conceal the fact that DPI was invited to bid.

50. When asked by MDM's employee Charles Clarke what other dealers were bidding, Eric Hill, the Girl Scout's bid manager, told Clarke that Xerox, Canon and Mita had supplied bids along with MDM. When Clarke expressly challenged Hill and stated that none of these could "meet spec", i.e., satisfy the RFP requirements, Hill replied, "Oh yeah, I got another bid from DPI and they are the lowest and meet spec".

### Discriminatory Conditions Imposed on Copy Machine Trials Favoring DPI

51. Girl Scouts imposed discriminatory testing conditions on machines bid by MDM and DPI to the prejudice of MDM.

52. On Thursday, September 23, 2004, Eric Hill instructed MDM to install a Network Ready Trial Unit Konica 7255 digital copier [one of the machines bid by MDM] on the Girl Scouts' 9th floor offices for a test run in Girl Scouts' "membership credentials" department. The machine was to be connected to the Girl Scouts internal network to determine its efficiencies as a multifunctional product and to evaluate its scanning capacities; one of the purposes of the "networked" trial was to enable documents to be scanned into Girl Scouts' computing systems from any copier location. See E-mail dated September 23, 2004 from Eric Hill to Charles Clarke, annexed as Exhibit 7.

53. On October 1, 2004, Charles Clarke wrote to Hill informing him that the users were favorably impressed with MDM's Konica machine offerings and that MDM was requesting that the unit be tested "at one of the…locations running high volume…so you can get a real good test of the capabilities and get more user feedback." See e-mail of Charles Clarke to Eric Hill, October 1, 2004, annexed as Exhibit 8 hereto.

54. Clarke had made this request because Girl Scouts had placed MDM's trial machines on the less trafficked 9th floor and had placed DPI's proposed machines on the busier 13th floor. Clarke believed that MDM's machines could not be adequately tested unless they were in a floor with equivalent traffic as the DPI machines so as to provide fair and equal test conditions.