55. Though the stated purpose of the trial was to test scanning and network capacities of the competing machines, Girl Scouts never connected the MDM machine to its network.

56. On October 4, 2004, Charles Clarke e-mailed Eric Hill to object that although the purpose of the trial was to evaluate printing and scanning, neither printer drivers nor scanning software was installed by Girl Scouts. Clarke also informed Hill that MDM's equipment had never been connected to the Girl Scouts' network and that the Girl Scouts IT department personnel (known to MDM as Gil and Joseph) had indicated that "it wasn't necessary any longer to connect the unit [the Konica machine]." See e-mail of Charles Clarke to Eric Hill dated October 4, 2007, annexed as Exhibit 9 hereto.

57. Girl Scouts had informed MDM that the primary purpose of the trial was to test the MDM and DPI machine offerings in real world multifunctional conditions, particularly to test the intersection of copy, print and scan capacities on the Girl Scouts' internal network.

58. As a result of Girl Scouts' failure connect MDM's machine to the network and Girl Scouts' failure to install print drivers or scanning capacity, MDM's offering in the bid was not tested in network conditions, a primary focus of the RFP.

59. In response to the failure to connect MDM's machine to the network, Charles Clarke advised Hill that he understood that "the only reason" to have installed the machine for trial was "to get a feeling on how the users [Girl Scout personnel] responded to the new print and scan technologies and to be able to differentiate between manufacturers [MDM's Konica and DPI's Mita]". Clarke also pointed out that the Mita equipment that was bid by DPI was being tested in a busier location and that fairness

required repositioning MDM's Konica unit to the same location so as to have a head-to-head comparison by the users. See E-mail of Charles Clarke to Eric Hill, dated October 4, 2007, Exhibit 9. This was Clarke's second request to move MDM's machine to a higher volume location: on October 1, 2004 Clarke had informed Hill that MDM's machine should be moved to a location "running high volume so you can get a real good test of the capabilities and get more user feedback." See e-mail of Charles Clarke to Eric Hill dated October 1, 2004, Exhibit 8.

60. Charles Clarke's careful and persistent efforts to obtain fair trials were responded to by Eric Hill with the response that "the trial was over as of today. I am going to sit with the three floors that had trials and make a decision." See E-mail of Eric Hill to Charles Clarke dated October 1, 2004, Exhibit 8. Hill made no reply to Clarke's detailed and well-documented October 4 request for equitable trial conditions. See e-mail of Charles Clarke to Eric Hill dated October 4, 2007, Exhibit 9. Thus, informed of discriminatory test conditions and a request to correct such disparate treatment between the two bidders, Hill simply declared the trial "over" and ignored MDM's request to provide fair and non-discriminatory trial conditions, further evidence of the discriminatory intent and effect of the RFP.

61. Hill rejected all efforts by MDM to enable MDM's machine to be placed on the network so as to be in fair competition with DPI and to place the MDM machine in a busier test area.

62. At the time of Eric Hill's refusal to accede to changes in the trials, Hill had already been informed that the users on the 9th floor, the limited test area allocated to MDM's proposed machine, had been favorably impressed with the MDM trials. On

17

October 4, 2004, the same day Clarke made his futile request for changes to the trial, a Girl Scouts employee, Marjorie Crawford, responded to Hill's inquiry concerning MDM's Konica machine. Crawford's response to Hill makes it clear that the 9th floor users were impressed with MDM's trial machine: "It is great, we love it," Crawford wrote Hill. See e-mail of Margaret Crawford to Eric Hill dated October 4, 2004, annexed as Exhibit 10, hereto. Despite this favorable report on MDM's machine, Hill still refused MDM's request to give the MDM unit more exposure at a busier location and on the network so as to be fairly tried in the same conditions as the DPI offering.

Girl Scouts Waives $40,000 Buyout and Network Requirements for DPI
Without Informing Other Bidders or Re-opening the Bid

63. DPI, which was declared the "winning" bidder by Girl Scouts, ultimately failed to deliver equipment meeting the specifications of the RFP or to make the $40,000 cash payment. These conditions were waived by Girl Scouts without informing MDM or other bidders that material conditions of the bid had changed.

64. Although awarded the bid, DPI failed to deliver copiers with network attachments and the DPI-vended copiers remained unconnected to the Girl Scouts' internal network, despite the express requirement of the RFP that the winning bid must provide such equipment and make such network connection.

65. MDM was never informed by Girl Scouts that the requirement of network attachment was no longer a part of the RFP and that this condition of the bid had changed; neither MDM nor other bidders were given the opportunity to rebid in view of the changed bid conditions.

66. DPI was thus given the unilateral opportunity, to the prejudice of other bidders such as MDM, to fulfill its bid without network attachments, a change in the bid requirements that materially altered the bid finances and that was unknown to MDM (or other bidders) at the time of MDM's bid. DPI failed to connect to the Girl Scouts' network nine (9) Mita copiers in the Girl Scouts' "satellite" copier locations ("satellite" machines are convenience copiers located randomly throughout the office as opposed to copiers placed in the Girl Scouts' central copy room). The cost for supplying network connectivity for each machine was $2,500 (Two Thousand, Five Hundred Dollars). By waiving this requirement, Girl Scouts freed DPI of an aggregate cost factor of $22,500 for these nine (9) machines, an advantage not made known to the other bidders, including MDM which included these costs in its bid. Using a standard interest cost factor of .0195 multiplied against 22,500, DPI was freed of a monthly cost factor of $438.75 over the sixty-month life of the bid, an advantage not made available to MDM or any other bidder.

67. Similarly, DPI did not make the required $40,000 payment to Girl Scouts, despite the express requirement of the RFP that "Your offer <u>must</u> include the buy-out of our existing equipment leases, which total $40,000. You <u>will</u> write a check to Girl Scouts of the USA for this amount." See RFP annexed hereto [emphasis added].

68. On July 7, 2005 upon inquiry by MDM counsel Bruce I. Afran as to whether DPI paid the $40,000, Girl Scouts counsel Patricia Cody told Afran that "the $40,000 payment was no longer needed". As the purported reason for this waiver, Cody claimed that because the installation of the machines was delayed from June 2005 to November 2005, there was no longer a need a need to buy out the existing leases. Such

"explanation" by Cody was a mere pretext for waiving the requirement in DPI's favor: MDM had earlier pointed out to Girl Scouts that their outstanding leases totaled no more than $13,000 and there was never any basis to the $40,000 buyout provision. See *supra* at para. 31.

69. Here again, to the prejudice of other bidders, including MDM, DPI was given the unilateral opportunity to supply the bid without the $40,000 buyout, a cost factor which had been dropped as a bid requirement, a fact never previously disclosed to MDM or other bidders.

<u>Without the $40,000 cost factor, MDM would have been the low bidder.</u>

70. Cody informed MDM's counsel on July 7, 2005 that MDM's bid was $743.000 per month higher than the winning bid, a cost factor that equaled $44,000 (Forty-four Thousand Dollars) over the life of the bid. On this basis, Cody stated to MDM's counsel that MDM's bid was $44,000 <u>higher</u> than the "winning" bid.

71. In actuality, without the $40,000 "buy-out" provision, MDM would have been the <u>low</u> bidder.

72. MDM's bid was subject to an interest cost factor of .0195 on the $40,000 cash payment component of the bid. The interest cost factor is the actual cost of money to MDM for the $40,000 payment over the life of the bid. When this interest factor is multiplied against the $40,000 buyout component, the $40,000 cash payment would have cost MDM a total of $46,800. Since this figure is greater than the $44,000 difference between MDM's bid and the "winning" bid, MDM's bid would have been $2,400 (Two Thousand Four Hundred Dollars) <u>lower</u> than the "winning" bid if MDM had known that it could bid without the $40,000 buyout provision.

<u>Girl Scouts knew that MDM was prepared to lower its bid
to account for changes to the $40,000 buyout requirement but Girl Scouts
refused to permit MDM to re-bid when the "buyout" condition was dropped.</u>

73. Girl Scouts had express knowledge at the time of the bids that MDM would have modified its bid to account for changes in the cash buyout condition. MDM's actual bid proposal anticipated that the $40,000 buyout condition could change.

74. In an e-mail dated June 10, 2004, MDM expressly advised Eric Hill that MDM's bid contained a line item specially dedicated to the $40,000 buyout provision that could change if the buyout figure changed:

> "Please note that the above figures also include the buyout of your Xerox contract at $40,000. I have listed this as a line item in the event that your buyout becomes less <u>this may be altered accordingly</u>."

See MDM proposal to Eric Hill, June 10, 2004, annexed as Exhibit 11 hereto [emphasis added]

75. Thus, MDM gave Girl Scouts express and specific notice that it was prepared to adjust its bid to take into account changes in the cash payment requirement.

76. Despite this express statement that MDM's bid was designed to permit the $40,000 component to be dropped if the requirement changed, Girl Scouts did not inform MDM until more than one year later, and only upon the inquiry of an attorney, that they had proceeded to implement the bid without the $40,000 buyout and that DPI, the "winning" bidder, was relieved of this obligation.

77. By the above language, MDM expressly gave notice to Girl Scouts that MDM's bid could be re-formulated based upon changes to or elimination of the $40,000

cash requirement, but, despite this express notice, Girl Scouts failed to notify MDM when the cash payment requirement was abandoned and failed to give MDM the opportunity to adjust its bid accordingly.

78. By failing to notify MDM of the abandonment of the buyout condition while permitting DPI to implement the bid without such condition Girl Scouts discriminated against MDM and other bidders for the purpose and/or effect of directing the bid award to DPI, a favored bidder.

COUNT I
(Sherman and Clayton Acts, 15 U.S.C. 1, et seq. and 15 U.S.C. 15, et seq.)

79. Each and every allegation set forth above is repeated herein as if more fully set forth below.

80. The RFP contained bid configurations and requirements designed to favor one bidder, DPI, by, *inter alia*, the inclusion of certain criteria, including equipment speed and other specifications along with certain equipment bundling not available to MDM and other respondents to the RFP other than DPI, such restrictive specifications being beyond the Girl Scouts' ordinary and usual needs and without commercial or economic justification.

81. All requests by MDM to the Girl Scouts to make commercially feasible modifications to the RFP to enable MDM (and other bidders) to bid competitively were ignored by Girl Scouts which failed to answer said inquiries.

82. The discriminatory structuring of the RFP had the effect of destroying MDM's business relationship built over many years with the Girl Scouts -- MDM lost the business of leasing/sales and servicing and vending of supplies for the Girl Scouts

copiers as a result of the award of the bid to DPI under unfair and discriminatory conditions.

83. The structuring of the RFP to favor DPI, the failure of the Girl Scouts to answer MDM's requests for reasonable commercial accommodations, the imposition of equipment bundling requirements that could be satisfied only by DPI in a commercially competitive manner, the use of discriminatory and/or unfair trial conditions and the effective exclusion of all other bidders from a level and fair bidding environment were intended for and/or had the effect of enabling a single bidder, DPI, to succeed as "winning" bidder.

84. The RFP was a rigged and corrupt bid discriminating in favor of a single bidder, namely DPI, to the exclusion of MDM and the other bidders.

85. By virtue of the knowing design of said bid by the Girl Scouts to favor a single bidder, MDM (and other bidders) was denied the opportunity to bid competitively and in a manner that would enable it to offer equipment conforming to the needs of the RFP at a competitive price.

86. As a result of the foregoing, MDM was denied the opportunity to bid on an equal basis with DPI and lost the business opportunity promoted by the bid, as well as MDM's long-term business with the Girl Scouts. These business opportunities were corruptly and/or knowingly directed by the Girl Scouts to DPI by the use and implementation of a discriminatory RFP.

87. Based on the foregoing, the Girl Scouts' design, use and implementation of the RFP and the award of the bid to DPI as described in this complaint, comprise anti-competitive practices in restraint of trade or commerce causing injury and damage to

MDM in violation of the Sherman Act, 15 U.S.C. 1, et seq., and the Clayton Act, 15 U.S.C. 15, et seq.

88. Wherefore Girl Scouts is liable to MDM pursuant to the Sherman and Clayton Acts, 15 U.S.C. 1, et seq., and 15 U.S.C. 15, et seq., for monetary damages in the minimum amount of One Hundred and Eighty-Nine Thousand, Three Hundred and Forty-three Dollars and Twenty Cents ($189,343.20), along with interest, cost of suit, attorneys fees and treble damages.

COUNT II<br>(Donnelly Act, NY General Business Law 340, et seq.)

89. Each and every allegation set forth above is repeated herein as if more fully set forth below.

90. Girl Scouts' design, use and implementation of the RFP and the award of the bid to DPI under such circumstances as described in this complaint, comprise anti-competitive practices and/or unfair trade practices in restraint of trade or commerce causing injury and damage to MDM in violation of the Donnelly Act, N.Y. General Business Law, Sections 340-347.

91. Wherefore Girl Scouts is liable to MDM pursuant to the Donnelly Act, N.Y. General Business Law, Sections 340-347, for monetary damages in the minimum amount of One Hundred and Eighty-Nine Thousand, Three Hundred and Forty-three Dollars and Twenty Cents ($189,343.20), along with interest, cost of suit, attorneys fees and treble damages.

## COUNT III
(Conspiracy under the Sherman and Clayton Acts,
15 U.S.C. 1, et seq. and 15 U.S.C. 15, et seq.)

92. Each and every allegation set forth above is repeated herein as if more fully set forth below.

93. DPI conspired, colluded and/or acted in concert with Girl Scouts in said practices and acts.

94. By virtue of its knowing design of the RFP to favor a single bidder, the discriminatory terms of the RFP, the waiver and forgiveness of material bid terms for the benefit of DPI, including the requirement of network attachment and the $40,000 buyout, waivers not made available to other bidders including MDM, the Girl Scouts colluded with and conspired with DPI and/or acted in concert with DPI to engage in anti-competitive practices in restraint of trade or commerce, causing injury and damage to MDM in violation of the Sherman Act, 15 U.S.C. 1, et seq., and the Clayton Act, 15 U.S.C. 15, et seq.

95. Wherefore Girl Scouts and DPI are liable jointly and severally for damages to MDM pursuant to the Sherman and Clayton Acts, 15 U.S.C. 1, et seq., and the Clayton Act, 15 U.S.C. 15, et seq., for monetary damages in the minimum amount of One Hundred and Eighty-Nine Thousand, Three Hundred and Forty-three Dollars and Twenty Cents ($189,343.20), along with interest, cost of suit, attorneys fees and treble damages.

## COUNT IV
(Conspiracy under the Donnelly Act, NY General Business Law, Section 340, et seq.)

96. Each and every allegation set forth above is repeated herein as if more fully set forth below.

97. DPI conspired, colluded and/or acted in concert with Girl Scouts in said practices and acts.

98. By virtue of its knowing design of the RFP to favor a single bidder, the discriminatory terms of the RFP, the waiver and forgiveness of material bid terms for the benefit of DPI, including the requirement of network attachment and the $40,000 buyout, waivers not made available to other bidders including MDM, the Girl Scouts independently or in collusion and conspiracy with DPI engaged in anti-competitive and unfair trade practices in restraint or trade or commerce causing injury and damage to MDM in violation of the Donnelly Act, N.Y. General Business Law, Sections 340-347.

99. Wherefore Girl Scouts and DPI are liable jointly and severally to MDM pursuant to the Donnelly Act, N.Y. General Business Law, Sections 340-347, for monetary damages in the minimum amount of One Hundred and Eighty-Nine Thousand, Three Hundred and Forty-three Dollars and Twenty Cents ($189,343.20), along with interest, cost of suit, attorneys fees and treble damages.

COUNT V
(Breach of the implied covenant of good faith)

100. Each and every allegation set forth above is repeated herein as if more fully set forth below.

101. An RFP is understood by those experienced in reasonable commercial usage to provide a fair and level playing field to enable a true low bidder to emerge through competitive bidding.

102. Contrary to this well-established commercial usage, the Girl Scouts structured the RFP to favor a single bidder, DPI, that was placed at a material advantage against other bidders, including MDM, and imposed discriminatory trial conditions,

among other acts of bad faith, to favor DPI. Despite express requests by MDM to provide accommodations to enable other bidders to successfully meet the substantive requirements of the RFP, Girl Scouts refused to change the required specifications and failed to answer MDM's express inquires for such accommodations, even where MDM's proposed substitutions would have reduced the Girl Scouts' cost of product. Among other failings to deal in good faith set forth above, despite express knowledge that MDM was prepared to reduce its bid to account for changes in the $40,000 buyout provision, Girl Scouts accepted DPI's bid and consummated the transaction with DPI without giving MDM an opportunity to re-bid after the buyout provision was waived.

103.    By failing to inform MDM of the waiver of the $40,000 buyout provision the Girl Scouts, induced MDM to bid higher by a quantum of $743.00 per month, or $44,000 over the life of the bid, when MDM's actual bid would have been *lower* than DPI's by a minimum of $2,400 if MDM had been permitted to bid in light of the abandoned buyout provision.

104.    By failing to inform MDM of the changed or waived conditions in the RFP, namely the waiver of the buyout fee and the requirement of network connectivity, the Girl Scouts denied MDM the ability to submit a competitive bid and MDM was induced to bid higher on the RFP than was economically necessary. As a result, MDM became the losing high bidder over DPI when MDM should have been the *winning* low bidder.

105.    The Girl Scouts' concealment of the waiver of the buyout deprived MDM of the opportunity to bid in light of changed conditions which would have enabled MDM to become the winning low bidder over DPI by a margin of at least $2,400.

106. By the foregoing acts and omissions Girl Scouts breached the implied covenant of good faith in which they represented through the RFP that all qualified bidders would be treated in a fair and equitable manner and given equal opportunities to bid on a competitive basis with all other bidders.

107. Wherefore, the Girl Scouts are liable to MDM for monetary damages in the minimum amount of One Hundred and Eighty-Nine Thousand, Three Hundred and Forty-three Dollars and Twenty Cents ($189,343.20), for breach of the implied covenant of good faith, along with interest, costs, attorneys fees and punitive damages.

## COUNT VI
### (Fraud)

108. Each and every allegation set forth above is repeated herein as if more fully set forth below.

109. By concealing the true economic terms and conditions of the RFP and concealing from MDM the changed and waived conditions of the bid, the Girl Scouts have engaged in a pattern of fraudulent deception and omission upon which MDM relied in good faith to its detriment.

110. Girl Scouts concealed from MDM that it had changed or waived conditions of the bid, namely the abandonment of the network connectivity and buyout conditions, and such conditions were material to MDM's structuring of its bid.

111. Girl Scouts concealed the waiver and/or release of these conditions until after it awarded the bid to DPI and after the bid contracts with DPI were consummated.

112. MDM relied on Girl Scouts' representation that such conditions were necessary to satisfy the terms of the RFP; MDM submitted its bid based on the presumed need to supply network connectivity and to make the $40,000 buyout payment.

113.  The reliance by MDM on the inclusion of such conditions caused MDM to bid higher than necessary thereby causing MDM to lose the bid, and to lose its long-term business relationship with the Girl Scouts.

114.  By its reasonable reliance on the existence of these conditions, MDM was induced to bid $44,000 dollars higher than the lowest bidder, DPI.

115.  Had MDM known that the $40,000 buyout condition was being waived, MDM would have submitted a bid without the $40,000 buyout and its resulting bid would have been at least $2,400 less than DPI, making MDM the "winning" bidder.

116.  By the terms of MDM's bid and its June 10, 2004 e-mail to Eric Hill, Girl Scouts had express knowledge that MDM was prepared to adjust its bid to account for changes in the buyout provision but despite such knowledge Girl Scouts failed to disclose to MDM that the buyout condition had changed.

117.  MDM relied to its detriment on the Girl Scouts' omission of the material change in conditions of the RFP causing MDM to be damaged by the lost business opportunity of the RFP.

118.  Wherefore, Girl Scouts is liable in fraud to MDM for monetary damages in the minimum amount of One Hundred and Eighty-Nine Thousand, Three Hundred and Forty-three Dollars and Twenty Cents ($189,343.20), along with interests, costs, attorneys fees and punitive damages.

WHEREFORE, plaintiff seeks judgment against defendant as follows:

1) On Count I against Girl Scouts for violation of the Sherman and Clayton Acts, 15 U.S.C. 1, et seq. and 15 U.S.C. 15, et seq. for monetary damages in the minimum amount of One Hundred and Eighty-Nine Thousand,

Three Hundred and Forty-three Dollars and Twenty Cents ($189,343.20), along with interest, costs, attorneys fees and treble damages.

2) On Count II against Girl Scouts for violation of the Donnelly Act, NY General Business Law, 340, et seq., for monetary damages in the minimum amount of One Hundred and Eighty-Nine Thousand, Three Hundred and Forty-three Dollars and Twenty Cents ($189,343.20), along with interest, costs, attorneys fees and treble damages.

3) On Count III against the Girl Scouts and DPI for conspiracy in violation of the Sherman and Clayton Acts, 15 U.S.C. 1, et seq. and 15 U.S.C. 15, et seq., for monetary damages in the minimum amount of One Hundred and Eighty-Nine Thousand, Three Hundred and Forty-three Dollars and Twenty Cents ($189,343.20), along with interest, costs, attorneys fees and treble damages.

4) On Count IV against the Girl Scouts and DPI for conspiracy in violation of the Donnelly Act, NY General Business Law, 340, et seq., for monetary damages in the minimum amount of One Hundred and Eighty-Nine Thousand, Three Hundred and Forty-three Dollars and Twenty Cents ($189,343.20), along with interest, costs, attorneys fees and treble damages.

5) On Count V against the Girl Scouts for breach of the implied covenant of good faith for monetary damages in the minimum amount of One Hundred and Eighty-Nine Thousand, Three Hundred and Forty-three Dollars and Twenty Cents ($189,343.20), along with interest, costs, attorney's fees and punitive damages.

6) On Count VI against the Girl Scouts in fraud for monetary damages in the minimum amount of One Hundred and Eighty-Nine Thousand, Three Hundred and Forty-three Dollars and Twenty Cents ($189,343.20), along with interest, costs, attorneys fees and punitive damages.

WHEREFORE, plaintiff respectfully requests that judgment be entered on the foregoing causes of action and for such additional relief as to the Court may seem just and proper.

Respectfully submitted,

_____
Bruce I. Afran
Attorney for Plaintiff
10 Braeburn Drive
Princeton, New Jersey 08540
609-924-2075

BA 8583

Local Office:

ZIMMET BIEBER, LLP
622 Third Avenue – 7th Floor
New York, N.Y. 10017
212-922-1330